## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **DANIEL R. WILSON,** | ) | **CASE NO. 5:09CV130** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| v. | ) | **MAGISTRATE JUDGE GREG WHITE** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | **REPORT AND RECOMMENDATION** |

Plaintiff Daniel R. Wilson ("Wilson") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying his claim for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

For the reasons set forth below, the Court recommends that the final decision of the Commissioner be affirmed.

### I. Procedural History

On January 18, 2005, Wilson filed applications for POD and DIB benefits alleging a disability onset date of July 11, 2003, and claiming that he was disabled due to fractured vertebrae, herniated discs, degenerative disc disease, compressed discs and post-traumatic stress disorder ("PTSD"). (Tr. 47) His application was denied both initially and upon reconsideration. Wilson timely requested an administrative hearing.

On April 17, 2008, an Administrative Law Judge ("ALJ") held a hearing during which

Wilson, represented by counsel, testified. Brett L. Salkin testified as the Vocational Expert ("VE"). On May 16, 2008, the ALJ found Wilson had the residual functional capacity ("RFC") to perform light work and, therefore, he was not disabled within the meaning of the Act. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

On appeal, Wilson claims the ALJ erred in his analysis of (1) Wilson's complaints of disabling pain and (2) the opinions of the treating physicians. (Doc. 16.)

## II. Evidence

**Personal and Vocational Information**

Born on August 27, 1973, and age 34 at the time of his administrative hearing, Wilson is a "younger" person. (Tr. 25.) *See* 20 C.F.R. § 404.1563. He has an eighth grade education. (Tr. 92.) His past relevant work experience was as a construction laborer, which was very heavy, unskilled work. (Tr. 25, 557.)

**Medical Evidence**

On July 11, 2003, Wilson was working in a trench when it collapsed. (Tr. 165.) After a prolonged extrication, he was transported to a hospital, where he was diagnosed with a burst fracture of his T-12 vertebrae, and treated non-operatively with bracing. (Tr. 165-182, 186.) On July 15, 2003, he was transferred to Edwin Shaw Hospital for rehabilitation. *Id*. The discharge summary dated July 26, 2003, noted that Wilson had no neurological deficits in his lower extremities. (Tr. 165.) Also, by the time of discharge, he could stand and walk 150 feet with contact guard assist. His sitting balance was good, his standing balance was fair and his ambulation balance was fair minus. *Id*.

On July 31, 2003, Wilson saw Richard S. Brower, M.D., for treatment.[1] (Tr. 195.) Wilson reported little sensation in his legs. Dr. Brower, however, stated as follows:

> On today's examination, he has knee and ankle reflexes intact and his dorsiflexor

---

[1] Wilson first visited Dr. Brower in June 2002 with complaints of low back pain. (Tr. 197.) At that time he was diagnosed with "degenerative disc disease L4-5, L5/S1 with HNP, radiculopathy, and lumbrosacral sprain/strain." *Id*.

2

> power seems to be fine although there is certainly variable effort especially on the R side. His hips and knees are moving well. The brace seems to fit him appropriately.

*Id.* Dr. Brower indicated that Wilson had some unusual complaints, but not much in the way of objective findings. *Id.* He ordered magnetic resonance imaging ("MRI") of the affected area. *Id.*

In August 2003, Wilson underwent an MRI of his lumbar spine which showed vertebral body height loss and bone marrow edema at T-12 and, to a lesser extent, T-11, consistent with compression type injuries. (Tr. 183.) The MRI findings also showed that Wilson had degenerative disc disease present at L4-5 and, to a lesser degree, L5-S1. *Id.*

After an office visit in September 2003, Dr. Brower noted that Wilson's fracture was healing without much difficulty. (Tr. 196.) Consequently, Dr. Brower advised him to start working his way out of the brace, and encouraged him to stop using the crutches. *Id.* At the next visit in November 2003, after Wilson was no longer using the brace and only using one crutch, Dr. Brower recommended an active physical therapy program, along with chronic pain management. *Id.* Wilson underwent approximately 52 physical therapy sessions until May 2004. (Tr. 199-217.)

In January 2004, Wilson saw Robert S. Geiger, M.D., at Falls Pain Management Center for an evaluation and for continued pain management.[2] (Tr. 220.) Wilson reported that his pain was "fairly well controlled with Celebrex and Maxidone." *Id.* Upon exam, Dr. Geiger found Wilson to be in no acute distress. *Id.* Even though Wilson maintained an arched back and presented in a very rigid stance when standing and sitting, he was able to get up on the exam table with minimal difficulty. *Id.* He had focal tenderness in his high lumbar/low thoracic area. *Id.* He had "pretty good" range of motion in his lumbar area until the outer ranges of motion, and then he had pain. *Id.* The report further stated as follows:

> He [did] not want to flex forward at all because of the pain in his back. He [did] have some mild sensory changes in his anterior thighs but he [felt] pressure. His SLR [was] not reduced. He still ha[d] fairly good muscle strength and tone in his

---

[2] Wilson first sought treatment for low back pain with Dr. Geiger in March 2003. (Tr. 222.) At that time, Dr. Geiger's assessment was degenerative lumbar disc disease and mild sciatica. (Tr. 223.)

3

> lower extremities.  Reflexive responses [we]re about 1 at the right knee, nothing at the left, both ankle jerks [we]re fairly brisk at about 2 and they [we]re symmetric.  He ha[d] no edema in his lower extremities.  He ha[d] good ankle movement.  He [could] stand on both toes.  He ha[d] strong dorsiflexion at the ankles.

*Id.*

On May 20, 2004, a physical therapist at Edwin Shaw Rehabilitation noted on an outpatient evaluation form that Wilson had a walking tolerance of one to one and one/half hours, a sitting tolerance of one-half to three-fourths of an hour, and a lifting tolerance of ten to fifteen pounds.  (Tr. 199.)

In a June 2004 letter addressed to the state agency, Dr. Geiger noted that Wilson had not been a candidate for surgery, and that he had been treated conservatively with physical therapy, medications and injections.  (Tr. 218 - 219.)  He further noted that with these treatments, he was only able to work for a short time (one-half hour to one hour) after which he would be in "significant and debilitating pain for two to three days."  *Id.*  Dr. Geiger based his opinion on clinical findings, including significant pain to palpitation of his low back and reduced truncal range of motion.  (Tr. 219.)  Dr. Geiger also noted that it was unlikely Wilson would be able to return to his former construction job.  *Id.*  He concluded that after the accident on July 11, 2003, it could be two to three years before the final outcome is known.  *Id.*

On December 23, 2004, Wilson underwent an independent medical examination with Mark S. Berkowitz, M.D., for purposes of his worker's compensation claim.  (Tr. 231-234.)  Upon examination, Dr. Berkowitz observed that Wilson walked without a limp and was not in acute distress.  (Tr. 232.)  He was able to get up on his toes and heels bilaterally.  *Id.*  The doctor reported that Wilson's thoracic and lumbar spine ranges of motion were somewhat limited, while his cervical spine range of motion was normal.  (Tr. 232.)  His straight leg raising was negative bilaterally, he had normal muscle strength in both lower extremities, and his motor tone was equal throughout.  *Id.*  Dr. Berkowitz opined that Wilson could not return to his past job as an underground utilities construction worker, but that he could perform sedentary work if he was allowed to change positions throughout the day.  *Id.*  Also, he would be limited to "driving, sitting, walking, pushing, pulling, climbing, and standing."  *Id.*

4

In January 2005, Dr. Geiger ordered another RFC evaluation. (Tr. 261-273.) Wilson was assessed as having the ability to perform light to medium level work with the ability to engage in self-paced lifting and carrying activities, allowances for postural changes and rest breaks, as needed, and allowances for strategies to self-manage reported symptom responses in the workplace. (Tr. 261-262.)

In May 2005, Wilson was examined by Joseph R. Leith, M.D., at the request of the Bureau of Disability Determination. (Tr. 315-317.) After examination, Dr. Leith concluded that Wilson's exam was normal in muscle function and sensation with no evidence of any radicular symptoms. (Tr. 317.) Based on this result, he opined that Wilson was not impaired in regard to sitting, walking, lifting, carrying, handling objects, hearing, speaking or traveling. *Id.*

Also in May 2005, Charles Derrow, M.D., a state agency physician, completed an RFC assessment. (Tr. 354-361.) He concluded that Wilson could perform medium level work (occasionally lift 50 pounds, frequently lift 25 pounds, stand/walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday). *Id.* Dr. Derrow based these findings on Dr. Leith's normal clinical findings. (Tr. 355.) For the same reason, Dr. Derrow also indicated that the severity of Wilson's alleged symptoms was not credible. (Tr. 359.)

In August, 2005, Dr. Geiger completed a lumbar spine RFC opining that Wilson could frequently lift and carry up to 20 pounds, and 50 pounds occasionally, walk two city blocks without rest, stand/walk about two hours in an eight-hour workday, sit more than two hours continuously, and at least six hours in an eight-hour workday. (Tr. 365-366.) He noted that Wilson could take a job where he is able to shift positions at will and occasionally take short unscheduled breaks. (Tr. 366.) Also, because Wilson experiences "good" and "bad" days, he could be expected to be absent from the workplace about twice per month. (Tr. 367.)

On October 20, 2005, Myung J. Cho, M.D., completed another RFC concluding Wilson could occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, and stand/walk six hours in an eight-hour workday. (Tr. 369.) Dr. Cho noted on the assessment that Wilson's statements regarding his limitations and pain were not credible as his physical evaluation was normal. (Tr. 373.)

Wilson continued treatment for chronic back pain at the Falls Pain Management Center with Jim P. Bressi, M.D., in 2005. (Tr. 478-480.) On December 11, 2006, Dr. Bressi noted tenderness to palpitation in the low thoracic spine. (Tr. 468-470.) He further noted that Wilson complained of ongoing pain despite the use of a TENS unit and medication. *Id*.

From February, 2006, through May 2006, Wilson treated with chiropractor Brian T. Longworth, D.C. (Tr. 412-445.)

In March 2006, Dr. Geiger requested another MRI, which showed that Wilson had 1) a remote mild superior compression fracture to T-12 without significant compressive features (which appeared benign); 2) remote minor ventral wedging of the T-11 vertebral body without compressive features (also remote and benign); 3) an otherwise unremarkable thoracic spine examination; and 4) incidental disc bulging at C6-C7 without compressive features. (Tr. 401-402.)

Dr. Geiger managed Wilson's pain with epidural injections and pain medication through October 2007. (Tr. 274-304, 389-90, 396-97, 410.) Throughout 2006-2007, Dr. Geiger noted that medications were effective in helping Wilson to tolerate his pain and there were no reported side effects. (Tr. 396, 388-90, 398-99.) Dr. Geiger also recommended vocational rehabilitation, which he noted could be somewhat protracted as Wilson reported that he was also studying to obtain a GED. (Tr. 389-90.)

In June 2007, Steven Smith, M.D., also of Falls Pain Management Center, noted moderate paraspinal muscle spasm and tenderness bilaterally in Wilson's hips. (Tr. 463.) In August 2007, Dr. Smith assessed Wilson with ongoing severe low back pain. (Tr. 393.) In December 2007, Dr. Smith ordered Wilson to continue the work conditioning program three times a week for six weeks as part of a vocational rehabilitation program. (Tr. 388.)

In December 2007, Wilson related to Dr. Bressi that his pain was moderately controlled with medication. (Tr. 387.) Dr. Bressi noted that the exam was unremarkable. *Id*. He indicated that there was moderate thoracic paraspinal muscular spasms noted, but Wilson's upper and lower extremity strength was equal and symmetric at 5/5. *Id*. Dr. Bressi further noted that Wilson was able to rise from a seated position without difficulty and his gait was steady. *Id.*

6

On January 16, 2008, William Habjan, D.O., a consulting doctor, completed an RFC assessment in which he concluded that Wilson could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and stand/walk six hours of an eight-hour workday. (Tr. 377-384.)

**Post-Traumatic Stress Disorder**

On July 20, 2004, Wilson sought psychiatric treatment with Steven B. Van Auken, Ph.D., at the request of the Bureau of Worker's Compensation for the purpose of determining whether Wilson suffered from post traumatic stress disorder ("PTSD") as a result of the July 11, 2003 accident. Dr. Van Auken concluded that Wilson met the criteria for a diagnosis of PTSD based on the evidence of recurrent thoughts of the accident, persistent nightmares, insomnia, irritability, and difficulty concentrating. (Tr. 229.) Additionally, he noted that psychological treatment would be in the form of approximately twenty to thirty sessions, lasting one hour each. (Tr. 230.)

On January 10, 2005, Wilson met with Thomas O. Hoover, Ph.D., psychologist, responding to the Bureau of Worker's Compensation request as to whether Wilson had reached maximum medical improvement. (Tr. 235, 236.) Following multiple testing and a lengthy psychiatric interview, Dr. Hoover concluded that Wilson was unable to work. (Tr. 235-260.) He noted that Wilson's psychological condition would not improve without "psychotherapeutic and possible psychoactive medication management." (Tr. 259.)

On May 5, 2005, Wilson underwent further psychiatric evaluation with Robert F. Dallara, Jr., Ph.D., in connection with his application for Social Security disability benefits. (Tr. 309-317.) Dr. Dallara noted impairment in judgment and insight, and depressed mood. (Tr. 310-311.) His diagnoses were Mood disorder, PTSD, Learning Disorder and Borderline Intellectual Functioning. (Tr. 312.)

Michael D. Wagner, Ph.D., completed a psychiatric review technique form for the period from May 5, 2005 to May 24, 2005. (Tr. 336-353.) He concluded that Wilson had the following mental impairments: learning, mood disorder, borderline intellectual functioning, PTSD (Listings 12.02, 12.04, 12.05, 12.06, respectively). (Tr. 337, 339, 340, 341.) However, as to the

functional limitations Dr. Wagner found only mild or moderate limitation, not marked or extreme. (Tr. 346.) Also, Dr. Wagner found there were no episodes of decompensation. (Tr. 347.) Dr. Wagner indicated that Wilson had the ability to carry out short and simple instructions. (Tr. 350.)

In June 2005, Wilson began psychiatric therapy and counseling with Anil Parikh, M.D. for depression and PTSD. The record shows that Wilson had almost weekly thirty-minute sessions with a psychotherapist from June 2005 through March 27, 2008. Throughout this period, he was also treated with medication. (Tr. 491-539.) In his decision, the ALJ noted that neither Dr. Parikh nor other counselors indicated any specific psychological restrictions. (Tr. 24.)

### Hearing Testimony

At the administrative hearing on April 17, 2008, Wilson testified that he is able to walk a couple hundred yards and stand for fifteen minutes to one-half hour without interruption. (Tr. 552.) He testified that he has pain in the middle of his back that goes down his hips and radiates to his neck and shoulders. (Tr. 558-559.) He stated it is a stabbing pain and that he is only pain-free while he is sleeping. (Tr. 559.) He also testified that he wakes in the night screaming from nightmares about being killed or his back hurting. (Tr. 555, 565.)

When asked by the ALJ what occurred on July 11, 2003, Wilson testified that he was putting in an underground sewer and the wall collapsed on his back, covering him, including his face, and that it took approximately thirty minutes to be rescued. (Tr. 551.) He stated that he did not walk again without help until approximately eight months after the accident. (Tr. 560.)

In describing a typical day, Wilson stated that he is out of bed by 8:00 a.m. and eats breakfast. (Tr. 551.) He usually sits on an ice pack for about thirty minutes and watches the news on television. *Id.* He stated that he does not need help getting dressed, except occasionally with his socks and shoes, depending on the day. (Tr. 552.) He testified that he remains at home until the afternoon when he has doctor appointments. *Id.* While he is in the house, he is often sitting on an ice pack, probably three hours each day. (Tr. 552-554.) He rotates four ice packs from the refrigerator. (Tr. 552.) He also uses an ice pack together with a TENS unit while

driving or at his child's ball game. (Tr. 554.) He stated that he does not use a cane, crutches, or a walker. (Tr. 552.) He said he is able to lift and carry a "couple gallons of milk." (Tr. 553.) He further testified that he cooks for the family (Tr. 552, 554, 569) and does the laundry in the basement, although he does not carry the baskets up the stairs. (Tr. 553.)

Salkin, the VE, testified that Wilson's past relevant work as a construction laborer was an unskilled job with a very heavy exertional demand. (Tr. 571.) The ALJ asked the VE to consider the following hypothetical:

> This hypothetical person is 34 years old and right dominant, eighth grade education. He can lift/carry 20 pounds occasionally, 10 pounds frequently. This person can sit six out of eight. Stand to 15 minutes at a time. Walk 100 yards. No limit on foot pedal. Occasional push/pull. This person can occasionally climb a ramp or stairs and occasionally use a ladder, rope, or scaffold. Can frequently balance. Occasionally stoop, kneel, crouch, and crawl. Occasionally reach overhead. No limits on handling, fingering, and feeling. No visual or communication limitations. No environmental limitations. This person should [do] only simple reading, not technical or complex. They should do simple, one to two step tasks. The task can be routine or repetitive with in the constraints that I've previously given.

(Tr. 572.)

In response, the VE stated that an individual reflecting these traits would not be able to perform Wilson's past relevant work. *Id.* However, the VE stated that such an individual would be able to perform the following jobs: watch guard, deliverer and mail clerk. (Tr. 572-573.)

Wilson's counsel asked the VE to consider the same hypothetical person with several additional limitations, the first being the requirement of a sit/stand option. (Tr. 574.) The VE responded that with that limitation, there would be no jobs available. *Id.* Counsel then asked the VE to consider the original hypothetical with the additional limitation of avoidance of stress. *Id.* The VE said the individual could perform the three jobs identified in the original hypothetical. *Id.* Next, counsel asked the VE to consider an additional limitation of avoiding continuous or sustained grasping with either hand. (Tr. 575.) The VE stated that this would eliminate the deliverer and mail clerk positions. *Id.* Counsel next asked the VE to consider that the hypothetical person must avoid repetition. (Tr. 576.) The VE testified that no jobs would be available for such an individual. *Id.* Lastly, counsel asked the VE to consider that the hypothetical individual would miss three days or more a month. *Id.* Again, the VE indicated

9

that no jobs would be available. *Id.*

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[3]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Wilson was insured on his alleged disability onset date, July 11, 2003, and remained insured until December 31, 2008. (Tr. 16.) Therefore, in order to be entitled to POD and DIB, Wilson must establish a continuous twelve month period of disability commencing between July 11, 2003 and December 31, 2008. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

### IV. Summary of Commissioner's Decision

The ALJ found Wilson established medically determinable, severe impairments, due to a

---

[3] The entire five-step process entails the following: First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

disorder of the back, degenerative disc disease of the lumbar spine and post traumatic stress disorder.  However, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. [Listing 1.04; Listing 12.06].  Wilson was unable to perform his past relevant work, but he had a Residual Functional Capacity ("RFC") to perform  light work with the following limitations: "he can lift/carry 20 pounds occasionally and 10 pounds frequently; sit six hours in an eight-hour workday; stand 15 minutes at a time and walk 100 yards; occasionally push/pull; occasionally climb a ramp or stairs; occasionally use a ladder, rope or scaffold; frequently balance, occasionally stoop, kneel, crouch and crawl; occasionally reach overhead; engage in simple reading, not technical or complex; perform simple one to two step tasks, tasks can be routine or repetitive with the constraints given."  (Tr. 20.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Wilson was not disabled.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

### A.  Wilson's Complaints of Disabling Pain

Wilson contends that the ALJ failed to properly analyze his complaints of disabling pain thereby depriving him of a fair and thorough assessment.  The Commissioner argues that the ALJ engaged in a lengthy analysis of Wilson's pain allegations and reasonably found that they

11

were inconsistent with the evidence.

According to the Social Security regulations, a claimant's "pain or other symptoms will not alone establish that [he is] disabled[.]" 20 C.F.R. § 404.1529(a). The Sixth Circuit has developed a two-part test for evaluating claims of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). This test, however, does not require objective evidence of the pain itself. *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994). When evaluating evidence of pain or other subjective complaints, the ALJ must consider the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) objective medical evidence; (2) subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions. *See* 20 C.F.R. § 404.1529. The ALJ may consider the claimant's credibility in assessing complaints of pain and his credibility determinations are entitled to great weight and deference if they are supported by substantial evidence. *Walters*, 127 F.3d at 531.

The measure of an individual's pain cannot be easily reduced to a matter of neat calculations. *Jones v. Sec'y of Health & Human Services,* 945 F.2d 1365 (6th Cir. 1991). There are no x-rays that can be taken that would objectively show the precise level of agony that an individual is experiencing. *Id*. Hence, in evaluating the intensity and persistence of pain, both physicians and laymen alike must often engage in guesswork. *Id*. The Commissioner's own guidelines acknowledge the most inexact nature of this evaluation:

> Medical history and objective medical evidence such as evidence of muscle atrophy, reduced joint motion, muscle spasm, sensory and motor disruption, are usually reliable indicators from which to draw reasonable conclusions about the intensity and persistence of pain and the effect such pain may have on the individual's work capacity. Whenever available this type of objective medical evidence must be obtained and must be considered in reaching a conclusion as to whether the individual is under a disability.

*Jones*, 945 F.2d at 1369-70, quoting S.S.R. 88-13.

Wilson contends that the ALJ did not apply the two-part test to evaluate Wilson's subjective complaints of pain. However, the ALJ clearly applied the test and relied upon evidence from Wilson's treating physicians that contradicts his pain allegations. The ALJ stated:

> After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment. . . .

(Tr. 21.)

The ALJ proceeded to analyze the objective medical evidence that undermined Wilson's pain complaints. First, the ALJ noted that Wilson did not require surgery, nor did he have any neurological deficits. *Id.* The ALJ then noted Dr. Brower's opinion that the fracture was healing and that Dr. Brower thought Wilson's "complaints were unusual as there was not much objective evidence correlating to his symptoms." (Tr. 21, 195-196.) Also, in November 2003, Dr. Brower's notes indicated that Wilson was ambulating "without a device or noticeable deficit." *Id.*

In addition, the ALJ relied upon Dr. Geiger who noted that in January 2004, Wilson was able to stand on his toes, "his ankle jerks were brisk, and he had strong dorsifexision of his ankles." (Tr. 22.) Wilson's treatment continued with injections and medication. *Id.* In September 2006, Wilson rated his pain at 8-9 out of 10, but Dr. Geiger observed that Wilson appeared more comfortable than his rating. (Tr. 22, 396.) In December 2007, Wilson related to Dr. Bressi that his pain was moderately controlled with medication. (Tr. 387.) Dr. Bressi also noted that the exam was unremarkable. *Id.* He indicated that there were moderate thoracic paraspinal muscular spasms noted, but Wilson's upper and lower extremity strength was equal and symmetric at 5/5. *Id.* Dr. Bressi further noted that Wilson was able to rise from a seated position without difficulty and his gait was steady. *Id.*

The ALJ also considered Wilson's daily and social activities in determining that his statements concerning the intensity, persistence and limiting effects of pain were not entirely credible. *See* 20 C.F.R. § 404.1529(c)(3)(i). Wilson testified as to his daily activities including

13

the "ability to drive, attend his son's games, do laundry, maintain appointments, and lift two gallons of milk." (Tr. 25.) These activities undermine Wilson's claims regarding his pain and support the ALJ's determination that his statements regarding pain were not entirely credible.

Lastly, Wilson argues that the ALJ did not take into consideration Wilson's mental limitations. However, after reviewing each doctor, the ALJ concluded that even though Wilson had PTSD, a severe impairment, his treating doctor, Dr. Parikh, as well as other counselors, never indicated any specific psychological restrictions. (Tr. 24.) Also, the RFC mental assessment conducted by Dr. Wagner indicated that Wilson had the ability to carry out short and simple instructions. (Tr. 24, 350.) The ALJ also considered whether Wilson's mental impairment met or equaled the criteria of listing 12.06 and concluded that neither "paragraph b" or "paragraph c" criteria were satisfied. (Tr. 19.) The ALJ properly considered Wilson's mental limitations.

The ALJ clearly evaluated the necessary factors and concluded that there was objective medical evidence and other factors upon which he relied. It is clear that substantial evidence supports the ALJ's decision and this Court should defer to his credibility determination. *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983.)

### B. Opinion Evidence of Physicians

Wilson contends that the ALJ did not properly analyze the opinions of his treating physicians. Specifically, he argues that the ALJ rejected opinions of his treating physicians for unacceptable reasons, and then relied on the opinions of Dr. Leith, a reviewing examiner, and Dr. Habjan, a consultative examiner. (Doc. No. 16 at 15-16.) The Commissioner argues that the ALJ properly assessed the treating physicians' opinions. (Doc. No. 18 at 11.) In fact, the Commissioner avers that "every medical source of record (treating, consulting and reviewing) rendered opinions that [Wilson] could work full-time, ranging from sedentary level work to light to medium level work." *Id.*

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence

14

in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 F. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[4]

The opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record.") (*quoting* SSR 96-2p).

Here, the ALJ appropriately explained the weight he gave to the opinions of the various physicians. As to Wilson's treating physician, Dr. Geiger, the ALJ gave great weight to his opinions that Wilson could not return to his former job in construction, and that he could lift up to twenty pounds. (Tr. 23.) The ALJ explained that these opinions were consistent with Dr. Leith's examination and Dr. Derrow's RFC dated May 2005. *Id.* However, the ALJ gave less weight to Dr. Geiger's opinion that Wilson was limited to standing/walking for two hours in an

---

[4]Pursuant to 20 C.F.R. § 404.1527(d), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

15

eight-hour workday. *Id*. The ALJ pointed out that even though Dr. Geiger was a treating physician, there was objective evidence to the contrary. Specifically, Wilson does not require the "use of an ambulatory aid, his lower extremity strength was normal, his gait was steady and his neurological status was not compromised." *Id*.

The ALJ gave greater weight to Dr. Leith's and Dr. Habjan's opinions. *Id*. Dr. Leith, an examining physician, concluded that Wilson's muscle function and sensation were normal and that he would not be impaired in regard to sitting, walking, lifting, carrying, or handling objects. *Id*. Also, Dr. Habjan, a consultative physician, noted that with postural limitations, Wilson could perform light to medium level tasks. *Id*. Both opinions are consistent with other substantial evidence in the record, including evidence from Wilson's treating physicians. *Id*. Two RFCs ordered by Dr. Geiger in 2005 concluded that Wilson could perform light to medium level work as long as he could shift postural positions and take rest breaks as needed. (Tr. 261-273; 365-366.)

Wilson argues that the ALJ rejected the opinion of Dr. Berkowitz, who examined Wilson one time, yet gave great weight to Dr. Leith's opinion, who also only examined Wilson one time. Dr. Berkowitz concluded that Wilson could do sedentary work as long as he was able to change positions throughout the day. (Doc. No. 16 at 17; Tr. 22.) The ALJ stated that he gave less weight to Dr. Berkowitz's opinion, not only because he examined Wilson a single time, but also because "his opinion reflected limitations secondary to the claimant's statements rather than clinical evidence." (Tr. 23.) Furthermore, the ALJ justified his reason for accepting Dr. Leith's opinion noting that it is supported by the functional capacity evaluation for light work.

Based on the treating and examining doctors' opinions and the RFC assessments, the ALJ properly evaluated the physicians' opinions.

16

## VII. Decision

For the foregoing reasons, the Court recommends that the decision of the Commissioner be affirmed as it is supported by substantial evidence.

                                                                                  s/ Greg White
                                                     United States Magistrate Judge

Date: January 7, 2010

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).** *See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**